

FILED

SEP - 2 1999

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

STEVEN KING AINSWORTH,

Petitioner,

v.

ARTHUR CALDERON, Warden, et al.,

Respondents.

NO. CIV. S-90-329 LKK/PAN

**DEATH PENALTY CASE**

ORDER

**I.**

**PROCEDURAL HISTORY**

Petitioner Steven King Ainsworth is a state prisoner sentenced to die after being convicted of first degree murder in the course of armed robbery and kidnaping. He brings this § 2254 petition to challenge the constitutionality of his death sentence. The claims relating to the guilt phase of his state court trial having been resolved previously, the court now turns to the asserted defects in the penalty phase.

////

198

**A. FACTS GIVING RISE TO THE CONVICTION[1]**

At approximately 3:00 p.m. on September 12, 1978, petitioner and Donald Bayles robbed Nancy Seng Huynh in a public parking lot in Sacramento. In the course of robbing Ms. Huynh, Ainsworth shot her in the right hip with a .45 caliber handgun. Ainsworth and Bayles then abducted Huynh in her car, fleeing north from Sacramento on back roads and using money from her purse to purchase beer and gas. When the trio exited the parking lot, Huynh was alive and seated upright in the front seat between Bayles and Ainsworth.

Bayles testified that Huynh remained alive for many hours after the shooting, repeatedly asking for help and a doctor. Bayles claims that he urged Ainsworth to take Huynh to a doctor, but that Ainsworth refused. Bayles also accused Ainsworth of raping Huynh. Bayles testified that he did not realize that Huynh was dead until about 24 hours after they had abducted her from Sacramento.

Ms. Huynh's body was found on January 20, 1979, in Elk Creek, California. When discovered, it was naked from the waist down and badly decomposed. Ainsworth and Bayles disposed of the body there and then headed for the Bay Area, picking up a hitchhiker near the Golden Gate Bridge and dropping him off in downtown San Francisco. They then drove to Mori's Point, less than a mile from petitioner's Pacifica residence, abandoned the car, and separated.

---

[1] All facts summarized here are drawn from the trial record unless otherwise noted.

When Ainsworth was finally arrested for the crime in San Francisco on May 3, 1979, Ainsworth used a false name and said to his companion, "That's it babe. This is sayonara."

**B. THE GUILT PHASE**

Ainsworth and Bayles were tried as co-defendants. Ainsworth declined to testify and Bayles shifted all blame for Huynh's death to Ainsworth. At the trial, the state abandoned the theory that petitioner intended to kill Huynh at the time that he shot her. Instead, the state argued that Ainsworth was guilty of first degree murder with special circumstances because he deprived Huynh of medical care after shooting her, and because Huynh would have lived if Ainsworth had obtained medical treatment for her. In its case-in-chief, the state elicited testimony from pathologist Dr. Joseph Masters that the cause of death was a bullet wound injury of the pelvis, but he could not determine whether the victim had died within seconds or days after sustaining the injury. The pathologist opined that under certain circumstances treatment would have saved Huynh's life. Ainsworth's trial counsel neither interviewed Dr. Masters before trial, nor sought other medical advice.

After the state presented its case-in-chief, Ainsworth moved for acquittal on the special circumstances charges pursuant to Penal Code § 1118.1.[2] The trial judge, the Honorable Joseph A.

---

[2] That statute provides:

"In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the

DeCristoforo, summarily denied the motion. On January 2, 1980, the jury convicted Stephen King Ainsworth of first degree murder with special circumstances, and Donald Bayles of second degree murder with special circumstances.

**C. THE PENALTY PHASE**

The penalty phase of the state proceedings commenced on January 4, 1980. The trial court first heard several motions from defense counsel, namely: that (then) Cal. Penal Code § 190.3 was unconstitutional; that a new jury should be empaneled for the penalty phase or, in the alternative, that the current jury be questioned for bias; and that the prosecution should be barred from relitigating petitioner's prior criminal history, or that defense counsel be afforded time to investigate petitioner's criminal history before commencing the penalty phase. After denying the motions, see Reporter's Transcript on Appeal ("RTA") 3232-3257, the jury was convened to hear evidence regarding petitioner's sentence. Although the prosecutor delivered an opening statement, petitioner's trial counsel, Brian Christiansen, did not. RTA 3261.

As evidence in aggravation, the prosecution presented a stipulation as to petitioner's two prior armed robbery convictions - one in 1968 and the other in 1972. The prosecution also

---

> evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal . . . ."

Cal. Penal Code § 1118.1.

presented testimony of the aggressive and violent behavior exhibited by petitioner after he shot Ms. Huynh but before he was apprehended. First, the state called Jay Campagna, who testified that two days after the murder petitioner held him up at gunpoint in the San Francisco convenience store where Campagna was employed, and stole $200. RTA 3265-3270. The state also called witness Robert Holley, who asserted that, on April 29, 1979, after he and petitioner had consumed four or five friendly beers at Mr. Holley's home, petitioner hit him on the head and strangled him until he lost consciousness, while directing petitioner's wife to remove some of Mr. Holley's belongings from the apartment. RTA 3270-3278. Lastly, the state called Dennis Ribble, who testified that about a week after Huynh was shot, petitioner declined Ribble's offer to purchase petitioner's gun. Ribble explained that petitioner told him that the gun "was hot" and that he "had shot a man in Sacramento" with it while robbing a liquor store. RTA 3299-3300.

As evidence in mitigation, the defense called petitioner's sixteen-year-old niece, Sherry Donsing. Ms. Donsing testified that her uncle was a talented painter, that he treated animals very kindly, and that she had never seen him hurt anyone or carry a gun. RTA 3282-3284. The defense also called petitioner's sister, Carol Donsing, who testified that their father had committed suicide sixteen years prior, that she never saw petitioner carry a gun, and that petitioner finished high school and attended some college. RTA 3284-3286. Also called on petitioner's behalf was Hazel Deacon, who lived with petitioner in 1977-1978. She attested that

while they lived together, petitioner held a full-time job and never "brutalized" her or anyone else in her presence. She also described a time when an auto accident happened near their home, and petitioner responded immediately by comforting an injured girl until the fire department arrived. RTA 3292-3304. Finally, petitioner called Coleen Yoho, who was petitioner's employer and landlord in 1978-1979. She stated that petitioner performed maintenance and carpentry for her and her husband, and that he was a good worker. RTA 3304-3307.

In closing, the state argued that a sentence of death was proportionate to both the crime and the defendant. The state suggested that the jury should avoid appeals to sympathy or emotion, but rather consider the circumstances attendant to petitioner's conviction, as established by the evidence produced during the guilt phase. RTA 3309-3323. In response, defense counsel appealed to the juror's morality and asked them to consider the inhumanity of the death sentence, and to consider the alternative sentence - being put in a cage for life - as a sufficient consequence. Defense counsel also observed that the law does not establish a preference for one sentence over the other. RTA 3323-3330.

After being instructed by the court, RTA 3330-3333, the jury deliberated for approximately one day and returned a sentence of death. RTA 3340. On January 30, 1980, the trial court rejected petitioner's motion for a modification of the sentence and affirmed the jury's verdict. RTA 3347-3366.

**D. PETITION FOR HABEAS CORPUS**

After his judgment and sentence was upheld by the California Supreme Court, see People v. Ainsworth, 45 Cal.3d 984 (1988), and the United State Supreme Court denied certiorari, see Ainsworth v. California, 488 U.S. 1050 (1989)(Brennan, J. and Marshall, J. dissenting), petitioner filed his § 2254 application in this court asserting twenty-nine claims of constitutional error.

Prior to reaching the merits of petitioner's claims, this court issued several orders, including a ruling that the magistrate judge properly exercised his discretion in conducting a Neuschafer hearing concerning the existence of any unexhausted claims. See Ainsworth v. Vasquez, 759 F.Supp. 1467 (E.D. Cal. 1991)(Levi, J., en banc). The court also concluded that the amendments to § 2254 in the 1996 Antiterrorism and Effective Death Penalty Act (AEDPA) did not apply to this petition. See Order filed August 23, 1996.

Regarding the merits, the magistrate judge first considered the several claims relating to the guilt phase of petitioner's trial, recommending that those claims be denied. Amended Findings and Recommendations ("F&Rs") filed June 5, 1995. However, I declined to adopt the recommendation as to petitioner's claim of ineffective assistance of counsel, and vacated his sentence.[3] On

[3] In his habeas petition, Ainsworth presented scientific evidence that there were at least three feasible scenarios in which resort to medical care would have been fruitless. Ainsworth argued that had his trial counsel elicited an expert opinion that the deprivation of medical care may not have caused the death - i.e. the death was an inevitable consequence of the initial shooting - there is a reasonable probability that the outcome of the trial would have been different. I concluded that trial counsel's

appeal, the Ninth Circuit reversed, and issued a mandate for the district court to resolve petitioner's penalty phase claims.[4] Upon consent of the parties, I declined to refer the remaining issues to the magistrate judge, and instead retained jurisdiction over the resolution of penalty phase claims.

**E. PENALTY PHASE CLAIMS**

Petitioner asserts that the following errors rendered his penalty phase trial constitutionally infirm:

R. Ineffective assistance of counsel at penalty phase;
S. Denial of continuance to investigate;
T. Use of invalid prior conviction;
U. Jury instructions on other crimes;
V. Use of absence of mitigation as aggravation;
W. Use of prior bad acts as aggravating factor;
X. Improper argument about victim's family;
Y. Defense argument about execution;
Z. Instruction on burden of proof;
AA. Denial of right to full consideration of mitigation evidence; and
BB. The cumulative effect of the foregoing alleged errors.

The parties agreed that those claims were to be resolved on the briefings and evidence already submitted, save for supplemental briefing as to intervening change in law. The record is now complete[5], including: twenty-four exhibits appended to the petition

---

failure to investigate and present this evidence undermined the outcome of the trial, then ordered the death sentence overturned. See Order filed August 23, 1996.

[4] The appeals court held that the experts' declarations proffered to the district court would not have added any new evidence that was not already before the jury. See Ainsworth v. Calderon, 152 F.3d 1223 (9th Cir. 1998).

[5] Regarding the evidentiary record before the court, the court previously concluded that petitioner's objections to the magistrate judge's order filed April 5, 1996 rejecting petitioner's

filed March 16, 1990; four declarations submitted with petitioner's motion for summary judgment filed June 25, 1993, the transcript of the oral deposition of Ainsworth's trial counsel, Brian Christiansen, lodged August 31, 1994; petitioner's answers to interrogatories filed December 18, 1995; and seventy-four exhibits lodged in February 1996. Thus I turn to the merits of petitioner's penalty phase claims.

## II.

## APPLICABLE LAW

At the time of petitioner's state court trial, California Penal Code § 190.3[6] provided that when a defendant has been found guilty of first degree murder, and one or more of the special circumstances enumerated in § 190.2 is found to be true, the trier of fact must determine whether the penalty shall be death or confinement in state prison for life without possibility of parole. In determining which sentence to impose, the decision-maker is directed to take into account specific factors relating to the crime and to the defendant,[7] and to "be guided by the aggravating

---

request to expand the record to include post-trial artwork and expert opinion were without merit. See Order filed May 21, 1996.

[6] Unless otherwise noted, all references to the California Penal Code are to those provisions in effect at the time of petitioner's crime.

[7] The statute in effect at the time of the offense conduct required the trier of fact to take into account:

> (a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1.

and mitigating circumstances." Penal Code § 190.3.

**III.**

**CLAIM R -- INEFFECTIVE ASSISTANCE AT PENALTY PHASE**

In claim R, petitioner asserts that Mr. Christiansen's inadequate performance during the penalty phase violated his Sixth

---

(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

(c) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(d) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

(e) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

(f) Whether or not defendant acted under extreme duress or under the substantial domination of another person.

(g) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the affects of intoxication.

(h) The age of the defendant at the time of the crime.

(i) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

(j) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.

At the time of Huynh's murder, a 1978 state ballot initiative amending this section had not yet been approved. See Cal. Penal Code § 190.3, Historical Note (West's Annotated, 1988).

Amendment right to counsel. Petitioner contends that his trial counsel failed to conduct any investigation of mitigating circumstances which might offset the evidence supporting his eligibility for the death sentence, and that the presentation of petitioner's defense during the penalty phase fell far below that to which he was constitutionally entitled.

**A. STANDARDS**

Whether defense counsel's performance is constitutionally adequate is measured by the well-known standard set forth in Strickland v. Washington, 466 U.S. 668 (1984), and its progeny. The right to effective assistance of counsel applies with equal force at the penalty phase of a bifurcated trial. Clabourne v. Lewis, 64 F.3d 1373, 1378 (9th Cir. 1995). A claim of ineffective assistance of counsel is a mixed question of law and fact and is reviewed de novo. United States v. Angelone, 894 F.2d 1129, 1130 (9th Cir. 1990).

As Strickland teaches, petitioner can prevail on his Sixth Amendment claim where counsel's deficient performance undermines the court's confidence in the outcome of the sentencing. The two-prong test first requires petitioner to show that trial counsel's performance fell below the wide range of professional competent assistance. Id. at 688; Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990). If so, then petitioner must show that counsel's inadequate performance prejudiced the penalty phase. Prejudice is established where the reviewing court's confidence in the sentence is undermined by trial counsel's failure to reasonably represent

the defendant. See Baylor v. Estelle, 94 F.3d 1321, 1324 (9th Cir. 1996). Implicit in this inquiry is whether "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockwell v. Fretwell, 506 U.S. 364, 372 (1993)(such unfairness results where defendant was deprived of substantive or procedural entitlements). Thus, petitioner must establish that there is a "reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, prejudice means a reasonable probability that a different sentence would have been imposed. Mak v. Blodgett, 970 F.2d 614, 619 (9th Cir. 1992).

**B. INADEQUATE PERFORMANCE**

1. Preparation and Investigation for Sentencing Phase

The record establishes that counsel's preparation in advance of the penalty phase was minimal. There is no evidence to support counsel's vague belief that he hired an investigator. Christiansen Depo. at 23:16-25:1 and Petitioner's Penalty Phase Exhibit ("Pet. Exh.") No. 63. It is undisputed that he did not have a law clerk or paralegal working with him on this case. Christiansen Depo. at 23:10-15. He later admitted that he abdicated the investigation of petitioner's psychosocial history to one of petitioner's relatives. Id. at 42:1-9. He also moved for a new trial, in part because he failed to investigate the issue of petitioner's sanity. RTA 3349. There is no genuine dispute that counsel failed to

////

examine petitioner's military record[8], prison record, or prior criminal history. Christiansen Depo. at 42:23-43:1. He obtained the police reports of petitioner's prior convictions only the day before the commencement of the penalty phase, RTA 3245, even though he had been on notice for two-and-a-half months that the state intended to present evidence of petitioner's prior criminal record as evidence in aggravation. Christiansen Depo., Exh. 1. He all but acknowledged his unpreparedness when he unsuccessfully moved for a continuance of the penalty phase so that he could prepare a rebuttal to the state's proffer of petitioner's prior criminal history. RTA 3245.

Counsel's handling of his witnesses during the penalty phase is also evidence of his inadequate investigation and preparation. As I explain in more detail below, the oral examinations failed to adduce substantive evidence in mitigation, and in one instance actually contributed to the evidence in aggravation.

In contrast, the investigation conducted subsequently on appeal consisted of a review of petitioner's California Department of Corrections file, and interviews of petitioner, his sister, and his maternal aunt. Pet. Exh. No. 64. Petitioner's state habeas counsel also obtained the probation report arising from the 1967 and 1972 convictions, <u>see</u> Pet. Exh. Nos. 24 & 36, the records of petitioner's hospital admission in 1964 for acute alcoholism, <u>see</u>

---

[8] Mr. Christiansen admitted at deposition that he did not even know that petitioner had been in the military. Christiansen Depo. at 61:20-21.

Pet. Exh. No. 22, and portions of petitioner's Army record. Pet. Exh. No. 13.

The post-trial investigation produced evidence that petitioner's parents were volatile alcoholics who often fought amongst themselves and possibly neglected the children physically and emotionally. Petitioner's father was apparently a "womanizer," who beat petitioner with a riding crop, and attempted to kill petitioner two or three times, all before committing suicide when petitioner was nineteen. Petitioner began ingesting intoxicating substances as early as age five, when he drank the dregs of his parents alcoholic beverages, and may have been an alcoholic by age sixteen when he attempted suicide. Pet. Exh. Nos. 17, 20 & 64.

Although petitioner joined the Army in 1961 when he was seventeen and was a productive soldier at first, he ultimately was discharged as undesirable due to his addiction to alcohol and morphine, a diagnosis of antisocial personality, and a civilian forgery charge. Pet. Exh. Nos. 13 & 24. The discharge occurred five months after his father's suicide.[9]

After committing a string of misdemeanors, petitioner was convicted of armed robbery in Sacramento County in 1968. Petitioner was paroled in September 1971 and enrolled in college, but soon dropped out. In 1972, he was again arrested for armed

---

[9] The evidence suggests that petitioner has felt particularly tormented at times, to the point of suicide, over his father's death. Pet. Exh. No. 22. Petitioner's suicidal thoughts were not uncommon in his family of origin. In addition to his father, a handful of other relatives had either committed or attempted suicide. Pet. Exh. No. 3.

robbery after holding up a pharmacy in Yuba County in order to obtain prescription drugs and money. His parole was revoked and, after he pleaded guilty, he was returned to prison until January 1977. Pet. Exh. Nos. 28 & 33-37.

On appeal, petitioner obtained expert testimony which would have been available at the time of trial had his trial counsel investigated. Petitioner's prison records associated with his prior convictions prompted a corrections expert to classify petitioner as an "above average prisoner" who would pose no threat to prison officers or other inmates if sentenced to life in prison. Pet. Exh. No. 70. Petitioner apparently adjusted well to prison life, and completed his high school requirements during his first imprisonment. Pet. Exh. No. 8. Expert testimony gathered by post-trial counsel diagnoses petitioner of suffering from both mental illness and substance abuse, and relates these condition to the physical and psychological abuse he suffered as a child. Pet. Exh. No. 71-72. These expert explanations would have been admissible as mitigating evidence relative to the character of a convict who is eligible for the death penalty. See Cal. Evid. Code § 801; People v. Murtishaw, 29 Cal.3d 733, 774 n.39 (1981); and Lockett v. Ohio, 438 U.S. 586, 608 (1978).

In sum, trial counsel could have interviewed family members and health care providers, could have reviewed petitioner's official records, and could have retained experts to testify to the significance of this evidence. Such an investigation if conducted at the time of trial would have readily disclosed evidence of:

parents who were depressed, alcoholic, abusive and neglectful; a history of suicide and attempted suicide in the family; early alcohol consumption and alcoholism; drug dependency; diagnosed mental disorders; notable behavior in prison; and above-average intelligence and artistic talent. None of this evidence was investigated nor discovered by Mr. Christiansen.[10]

2. **Presentation of Mitigating Evidence**

Trial counsel's lack of preparation for the penalty phase was painfully evident during the presentation of his case. The mitigating evidence presented on petitioner's behalf consisted of short examinations of four witnesses.[11] First, the defense called petitioner's niece, Sherry Donsing, who was just sixteen years old at the time. Providing short answers, she testified that she went fishing and to the mountains with "Uncle Steve," that he took her to the mountains and to go fishing, that he treated animals "very kindly," that she had never seen him hurt anybody or carry a gun, and that he "paints and draws." RTA 3281-3283.

Next, the defense called Sherry's mom and petitioner's sister, Carol Donsing, who stated simply that petitioner's father had

---

[10] Whether or not all of the evidence, such as the expert testimony, would have actually been adduced at the penalty phase, investigation into this information would have informed counsel's capacity to argue on petitioner's behalf those circumstances in mitigation and to focus the jurors' attention on the circumstances in petitioner's background which perhaps militated against the death penalty.

[11] The testimonial evidence presented by Mr. Christiansen consumes only twelve and a half pages of trial transcript. RTA 3281-3287, 3302-3309.

committed suicide. She also testified that other than having "tussles" with petitioner, he never hurt her, or anyone else in her presence. She stated that petitioner had "some college in San Francisco," and that petitioner was married. RTA 3283-3286. On cross-examination, the state elicited the fact that for most of the time from 1968-1978, petitioner was in prison. RTA 3286-3287.

Trial counsel then called petitioner's former girlfriend, Hazel Deacon, who attested that, during the year she lived with petitioner, he worked full-time, he never "brutalized" her, he comforted a child who had been in a car accident, and that they talked about getting married "a couple of times." RTA 3302-3304. Counsel's lack of preparation led to the admission of evidence in aggravation when he questioned Ms. Deacon whether she had ever seen petitioner with a firearm - to which she simply replied, "Yes." RTA 3303. Of course, that admission allowed the prosecution to elicit from Ms. Deacon on cross-examination that petitioner possessed the gun near "the very end of September or very beginning of October [of 1977]" and that petitioner "was planned on robbing a bank, only there was too many police around." RTA 3304-3305.

Last, counsel called Coleen Yoho, who became petitioner's landlord and employer in San Francisco shortly after Hunyh's death. She stated that he was a good worker, and that she and her husband sometimes socialized with petitioner and his wife. She stated that during the six months she knew him, she never saw him attack anyone or carry a firearm. RTA 3305-3307.

////

After this abbreviated testimony, Mr. Christiansen's brief closing argument - comprising seven pages of trial transcript - never even referenced any of the evidence that he did present. RTA 3324-3330. Indeed, the absolute want of any link between the meager evidence presented, the substance of Mr. Christiansen's closing argument, and the relevant legal inquiry when considering a sentence of death, see Cal. Pen. Code § 190.3, establishes that counsel's representation was inadequate.[12] Of course, the question is whether counsel's inadequate performance was constitutionally infirm.

### 3. Measuring Counsel's Performance

There is a strong presumption that defense counsel's performance falls within the wide range of reasonably professional assistance and thus great deference must be afforded to the manner in which counsel defended his client. Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994). Nonetheless, at the very least, counsel has a duty to investigate aspects of petitioner's character and background, as well as any other evidence which could be offered in mitigation of the death penalty. Skipper v. South Carolina, 476 U.S. 1 (1986); Lockett v. Ohio, 438 U.S. 586, 608 (1978); and Williams v. New York, 337 U.S. 241 (1949). While that

---

[12] The court can hardly understand counsel's failure to recollect most anything of substance about representing Mr. Ainsworth. His deposition testimony taken in 1991 about his trial preparation and tactical decisionmaking is punctuated by his failure to recall or remember virtually every aspect of his investigation and the proceedings. This despite the fact that this was *his very first death penalty case*.

duty is limited to those investigations which are reasonable and deference shall be afforded to counsel's trial tactics accordingly, an attorney's performance will be found deficient where the attorney "neither conducted a reasonable investigation nor demonstrated a strategic decision for failing to do so." Hendricks v. Calderon, 70 F.3d 1032, 1036 (9th Cir. 1995), cert. denied, 517 U.S. 1111 (1996). This principle "is so fundamental that the failure to conduct a reasonable pretrial investigation may in itself amount to ineffective assistance of counsel." United States v. Tucker, 716 F.2d 576, 582 n.16 (9th Cir. 1983). Thus, where a particular line of potentially mitigating evidence is not investigated there must be some evidence that the decision not to investigate was "the product of a reasoned choice." Correll v. Stewart, 137 F.3d 1404, 1412 (9th Cir. 1998).

Here, the record establishes that Mr. Christiansen may have spoken with one of his four witnesses for ten minutes on the morning of her testimony during the penalty phase, see Pet. Exh. No. 68, and that he may have obtained some of petitioner's school records. Christiansen Depo. at 42:28. No other evidence of any preparation for the penalty phase exists. Nor could counsel later recall what steps he may have taken to decide to decline to investigate, or how he arrived at his strategic plan for the penalty phase. As post-trial counsel has demonstrated, mitigating evidence was available had trial counsel searched for it. Because there is no evidence which suggests that Mr. Christiansen's failure to investigate and obtain mitigating evidence was the product of

reasonable judgment or tactical decisionmaking, counsel did not meet his constitutional duty to prepare for the defense of his client. Clabourne v. Lewis, 64 F.3d 1373, 1385 (9th Cir. 1995) (finding counsel incompetent where there were no tactical reasons for failing to investigate and present available evidence of mitigation).

As I detail more thoroughly below, counsel's lack of preparation and investigation also deprived petitioner of his constitutional entitlement to have mitigating evidence presented on his behalf. See Skipper v. South Carolina, 476 U.S. 1 (1986) and Lockett, 438 U.S. at 586. Where a penalty phase defense is so disorganized and cursory as the one provided by Mr. Christiansen, counsel's performance falls below the objective standard of reasonableness under Strickland. Bean v. Calderon, 163 F.3d 1073, 1078 (9th Cir. 1998). I thus conclude that trial counsel's performance was constitutionally deficient.

**C. PREJUDICE**

I now turn to whether counsel's incompetence prejudiced the outcome of petitioner's sentence. During the penalty phase, the state presented its case by adducing evidence in aggravation and arguing the relevance of that evidence to each of the ten factors which the factfinder was directed by statute (and in this case by the jury instructions) to consider when deciding whether to affix a sentence of death.[13] To illustrate how counsel's failure to

---

[13] The applicable statute instructed the trier of fact to "consider, take into account and be guided by such aggravating and

present or argue evidence in mitigation impacted the penalty phase, I make the following findings based upon the trial transcript.

1. **Enumerated Factors**

a. **Present Conviction**

The jury was first asked to consider "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1." Cal. Penal Code § 190.3(a). Since the same jury heard the evidence of the crime during the guilt phase and rendered a unanimous verdict as to petitioner's culpability, the prosecutor presented no evidence as to this factor in the penalty phase.

However, during his closing argument the prosecutor asked the jury to consider whether the death penalty was "proportionate to and appropriate for the circumstances of this crime." RTA 3310. He urged the jurors "not to detach [themselves] totally from the awful, awful facts of this case," but rather to have "a sense of righteous indignation about" them. RTA 3312. He classified the

---

mitigating circumstances" as are enumerated below. Cal. Penal Code § 190.3. The trial court instructed the jurors to "consider, take into account, and be guided by the following factors, if applicable." RTA 3331. Although the prosecutor spoke of the enumerated factors as "aggravating" and "mitigating," RTA 3315, *passim*, the jury was not instructed by the court to consider the evidence in those exact terms. Because the applicable 1977 statute was a "nonweighing" statute, see Williams v. Calderon, 52 F.3d 1465, 1479 (9th Cir. 1995)(1977 California death penalty law crafted a nonweighing regime), the trial court's omission of these terms is probably less important than whether mitigating evidence was in fact presented to the factfinder. See, e.g., Skipper v. South Carolina, 476 U.S. 1 (1986) and Lockett v. Ohio, 438 U.S. 586 (1978).

crime committed by petitioner as totally lacking in humanity. RTA 3314-15.

In response, defense counsel asked the jurors to reflect on the notion that, even if they believed that petitioner was guilty beyond reasonable doubt, if they retained any possible doubt that he was guilty of special circumstance murder then they should select life without possibility of parole. RTA 3326-27.

**b. Prior Criminal or Violent Activity**

The jury was also instructed to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Cal. Penal Code § 190.3(b). The state offered a stipulation of petitioner's two prior arrests and convictions for armed robbery.[14] RTA 3261. Called on behalf of the state was convenience store employee Jay Campagna who testified that petitioner robbed the store on September 14, 1978 while pointing a gun at Campagna. RTA 3265-3270. Robert Holley also attested to when petitioner violently attacked him and stole his personal belongings. RTA 3271-78. Lastly, Dennis Ribble testified that petitioner told him that he had robbed a liquor store, and shot a man with a gun and kept the body in the car for three days.

---

[14] The record establishes that the prosecutor was prepared to present detailed evidence in aggravation about petitioner's conduct relative to the 1972 robbery, and about a violent incident in Burlingame in 1978. The state agreed not to present this particularized evidence only in order to avoid a continuance of the penalty phase, as Mr. Christiansen admitted that he had not prepared to rebut this evidence.

RT 3299-3301.

As Mr. Christiansen has confessed, he had not investigated petitioner's prior criminal history and sought a continuance of the penalty phase in order to rebut the state's offer of proof. Had he prepared, he would have learned that petitioner was unarmed in the 1968 robbery, and that his participation was limited to driving the get-away vehicle. Pet. Exh. Nos. 27 & 30. He also would have learned that petitioner was a productive prisoner who adjusted well to prison life and posed no disciplinary concerns to the corrections staff. Further investigation may have allowed him to challenge the state's witnesses to the unproven criminal incidents. If this investigation had been conducted, the jury could have heard possibly mitigating evidence to clarify or offset the apparent frequency of his violent criminal behavior.

Instead, the record is devoid of any such evidence. Indeed, counsel's poor preparation actually added to the evidence already in aggravation, when he allowed Hazel Deacon to testify to a previously undisclosed plan petitioner had to rob a bank. RTA 3303-3305.

Thus, in closing argument the state was able to summarize all of this evidence and deliver an illustration of a man who engaged in criminal activity with regularity. The prosecutor argued:

> Twice in 1968 and 1972 sentenced to state prison, armed robbery. Punctuated by this case, September 12 and 13th, 1978. September 14, 1978, armed robbery, San Mateo. Hazel Deacon told you something else yesterday.

> In October or so, '78, Mr. Ainsworth was in San Francisco there with a gun talking about pulling a bank robbery. Again, threatening this type of violent criminal activity.
>
> We then skip to April 1979, April 29th, and we have Mr. Ainsworth, just senselessly, that's the only way you can describe it, senselessly attacking Mr. Holley, who for all he believed was there having a beer with a friend, the next thing he knew he was knocked down and Mr. Ainsworth and his wife were stealing his material possessions. A good friend, just knocking him down and looting him.

RTA 3315-16. The prosecutor identified the sum of this evidence as a factor in aggravation. RTA 3316.

In contrast, Mr. Christiansen merely suggested that even if petitioner was "not a nice person," his life still had value. RTA 3325.

c. **Mental or Emotional Disturbance**

Also important to the consideration was "[w]hether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance." Cal. Penal Code § 190.3(c). The prosecutor argued to the jury that petitioner was not under the influence of extreme mental or emotional disturbance, was not crazy, was not under work pressure but committed the crime "because of a desire to steal, to kidnap, to rape and to kill." RTA 3316. The prosecutor identified this desire as a factor in aggravation. RTA 3316.

Had petitioner's counsel conducted an adequate investigation into his client's military, health and prison records, he would have found documentation that petitioner had been diagnosed as suffering from several mental illnesses, and was addicted to

alcohol and other drugs. Counsel would have learned that many of petitioner's relatives suffered from severe mental illness and suicidal ideation. Counsel would have learned that petitioner's history suggested that his criminal activity was related to satisfying his substance addictions. This evidence could have been offered in mitigation to explain petitioner's state of mind. But it was not offered, much less investigated.

Similarly, in closing argument, counsel could have asked the jury to recall the testimony of petitioner's co-defendant, Donald Bayles, who claimed that the two had each consumed up to five beers the morning before abducting Nancy Huynh, and that they repeatedly purchased and consumed six-packs of beer over the course of the next twenty-four hours as they drove Huynh around Northern California. This evidence could have been offered to mitigate petitioner's presence of mind during the ordeal.

**d. <u>Victim's Participation</u>**

The factfinder was also to consider "[w]hether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act." Cal. Penal Code § 190.3(d). The prosecutor opined: "It is hard to conceive of a more innocent victim than Nancy Huynh, who on September 12th, 1978, was just trying to lead her life like the rest of us . . . . There is no mitigation in the conduct of the victim in this case." RTA 3316-17.

Petitioner's counsel offered no evidence or argument relating to this factor.

e. **Justification or Extenuation**

Also germane to the sentencing determination was "[w]hether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct." Cal. Penal Code § 190.3(e). The prosecutor referred the jury to the evidence underlying the conviction, condemning petitioner because he had "played God with Nancy Huynh's life, that is an immoral justification of him for his conduct." RTA 3317.

Petitioner's counsel offered no evidence or argument relating to this factor.

f. **Duress or Domination**

The sentencer was also asked to weigh whether or not defendant "acted under extreme duress or under the substantial domination of another person." Cal. Penal Code § 190.3(f). The prosecutor argued,

> There is no question who was in charge from the moment that car left the parking lot until it found its final resting place on the cliffs above Pacifica. There is no question Mr. Ainsworth was not forced by anybody or anything to do anything except exercise his own free will. That aggravates the crime.

RTA 3317.

Given that petitioner's co-defendant testified at the guilt phase, Mr. Christiansen had an opportunity in his cross-examination to adduce testimony attacking the co-defendant's credibility in casting the blame upon petitioner. However, Mr. Christiansen did not do so.

g. **Mental Capacity**

The court also instructed the jury to consider "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the affects of intoxication." Cal. Penal Code § 190.3(g). The prosecutor again recalled the facts of the case, and argued that because petitioner had consumed "at most a few beers . . . he appreciated the criminality of his conduct and chose not to conform it." RTA 3318. In fact, the evidence suggested that over the twenty-four hour period preceding Huynh's death, petitioner had consumed perhaps twelve or more beers and, in any event, was an alcoholic. Mr. Christiansen failed to refute the way the state minimized petitioner's intoxication, thus depriving petitioner of potentially mitigating evidence.

h. **Age**

"The age of the defendant at the time of the crime" was an added factor to consider. Cal. Penal Code § 190.3(h). Noting that petitioner's sister had attested to his age, the prosecutor opined that because petitioner was an full grown adult, that was a factor in aggravation.

i. **Role as Accomplice**

An additional guiding factor was "[w]hether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor." Cal. Penal Code § 190.3(i). As to this factor, the prosecutor reminded the

jury that their verdict established that "Mr. Ainsworth was the heavy in this crime." RTA 3318.[15] Mr. Christiansen could have opened this to debate by attacking Bayles' vague and inconsistent trial testimony. RTA 2569-2841.[16] Instead, Mr. Christiansen adduced no evidence and argued nothing to counter the state's portrait of petitioner's role in the crime.

j. **Other Extenuating Reasons**

Lastly, the sentencer was to consider any other circumstance which extenuates the gravity of the crime even though if not a legal excuse for the crime. Cal. Penal Code § 190.3(j). The prosecutor again focused in great detail on the manner in which Huynh was killed, suggesting that the immorality of the killing obliterated any other excuse which could be offered as an extenuating circumstance. RTA 3320-21. Petitioner's counsel did not speak to this factor.

2. **Analysis**

As to each of the enumerated factors, petitioner is constitutionally entitled to have the jury hear any available evidence in mitigation. Skipper v. South Carolina, 476 U.S. 1 (1986) and Lockett v. Ohio, 438 U.S. 586, 608 (1978). The details of the post-trial investigation summarized above establish that

[15] Petitioner's co-defendant was sentenced to eight years imprisonment for second-degree murder.

[16] Bayle's testimony during the guilt phase was largely incoherent and riddled with inconsistencies. The one thing that his testimony made clear is that Bayles was too intoxicated during the long ordeal to remember much of anything that occurred.

counsel's failure to adequately investigate petitioner's background prevented him from either presenting any detailed mitigating evidence on petitioner's behalf, or strategically deciding not to do so.

In addition, counsel also failed to present the little mitigating that he did have, again without any evidence that the omission was due to a tactical choice. In support of petitioner's motion for a new trial based on ineffective assistance of counsel, Mr. Christiansen conceded that he omitted testimony relating to a phone call petitioner made to the District Attorney's office when he learned there was a warrant for his arrest in connection with Huynh's murder. RTA 3349. Thus, he failed to introduce possible mitigating evidence of petitioner's acceptance of responsibility.

To be sure, it is difficult for a court to predict whether the jury would have construed certain evidence if presented as mitigating or aggravating. See Tuilaepa v. California, 512 U.S. 967, 976 (1994)(evidence of age may be considered in mitigation or aggravation, depending on the circumstances); Harris v. Pulley, 885 F.2d 1354, 1380-83 (9th Cir. 1988)(same for personality disorder). The court's own judgment about what is mitigating and what is aggravating in a particular case may be different than the jury's view. Tuilaepa, 512 U.S. at 976.

Nonetheless, the penalty of death cannot be imposed without an individualized sentencing determination, which is satisfied only when the factfinder can consider all potentially mitigating evidence. Blystone v. Pennsylvania, 494 U.S. 299, 307 (1990).

Thus, while it may be difficult for a judge to conclude that an outcome of a death penalty proceeding in a standardless, nonweighing state would have been different if counsel had presented available evidence in mitigation, see Williams v. Calderon, 52 F.3d 1465, 1479 (9th Cir. 1995), prejudice is still established where the court's confidence in the outcome of the sentencing is sufficiently shaken because all mitigating evidence was not adduced. Baylor v. Estelle, 94 F.3d 1321, 1324 (9th Cir. 1996). See also Hendricks v. Calderon, 70 F.3d 1032, 1043-44 (9th Cir. 1995) ("the Constitution prohibits the imposition of the death penalty without adequate consideration of factors which might evoke mercy").

Here, potentially mitigating evidence developed by post-conviction counsel regarding petitioner's family and social background that was available to trial counsel had he looked is both substantial and significant. Prejudice is established where "the family portrait painted at the federal habeas hearing was far different from the unfocused snapshot handed the superior court jury." See Bean v. Calderon, 163 F.3d at 1079-80 (9th Cir. 1998) (finding prejudice where the state court jury had no knowledge of the emotional and physical treatment the defendant suffered as a child).

Moreover, counsel's failure during closing argument to focus the jury on the worth of the life of Stephen King Ainsworth was inexcusable. Clabourne, 64 F.3d at 1386-87 (perfunctory argument based on weak evidence contributed to prejudice of penalty phase).

This is not a case where the presentation of the mitigating evidence would have been cumulative of evidence already before the court. Cf. Babbitt v. Calderon, 151 F.3d 1170, 1176 (9th Cir. 1998). Other than insubstantial testimony provided by Carol and Sherry Donsing, Hazel Deacon, and Coleen Yoho, the jury knew nothing about petitioner's history or his circumstances. To the contrary, the weight of the evidence omitted was so substantial compared to that actually presented during the penalty phase defense, that it is reasonably likely that the outcome of the proceedings may have been different.

Christiansen's representation at the sentencing hearing "amounted in every respect to no representation at all." Blake v. Kemp, 758 F.2d 523, 533 (11th Cir. 1985)(quoted in Clabourne v. Lewis, 64 F.3d 1373, 1387 (9th Cir. 1995)). When counsel's inadequate performance renders the result of the trial unreliable or the proceeding fundamentally unfair, the prejudice standard is satisfied. Lockhart v. Fretwell, 506 U.S. 364, 372 (1993). Given all of the above, I find that due to trial counsel's failure to investigate and present any meaningful mitigating evidence on petitioner's behalf, even without his blundering contribution to the aggravating evidence, there is a reasonable probability that the jury would have imposed a sentence other than death.

Because counsel's defense of petitioner on the penalty phase was constitutionally deficient, and because his inadequacy prejudiced the outcome of petitioner's sentencing, I must grant petitioner's habeas petition on his claim of ineffective assistance

of counsel.

IV.

**CLAIM S - DENIAL OF CONTINUANCE TO INVESTIGATE**

At commencement of the penalty selection phase of his trial on January 4, 1980, the state was prepared to offer evidence of two prior convictions and three uncharged offenses as follows:

1. A conviction for armed robbery in Sacramento County in January 1968;
2. A conviction for armed robbery of a pharmacy in Yuba County in October 1972;
3. An uncharged assault and battery in Burlingame, San Mateo County, in June 1978;
4. An uncharged armed robbery in San Mateo in September 1978; and
5. An uncharged robbery incident in San Francisco in May 1979.

Penal Code § 190.3 gave notice that the state might use petitioner's prior crimes to support imposition of the death sentence. Furthermore, on October 19, 1979, prior to trial, the state gave written notice of its intent to offer this specific evidence.

At the commencement of trial, petitioner admitted the fact of the 1968 and 1972 robbery convictions. He possessed the police reports about the September 1978 and May 1979 uncharged robberies but claimed that he had not been able to obtain the reports of the earlier crimes. RTA 3245. On January 3, 1980, just prior to the penalty phase, the state furnished to petitioner's counsel copies of the police reports about the 1968 and 1972 robbery convictions and June 1978 assault. On January 4, petitioner sought a 30-day continuance. RTA 3246. Petitioner's counsel claimed he needed the

time to prepare a defense based upon an investigation of petitioner's role in the offenses. RTA 3247-48.

To avoid the requested continuance, the state agreed to limit its proof of the first matters to the fact of the 1968 conviction evidenced by a certified copy of the verdict finding petitioner guilty of first degree robbery without mention of whether he was actually armed. RTA 3248-49. The prosecutor admitted he did not know petitioner's role in the 1968 armed robbery and said it was possible that petitioner drove the getaway car or was involved in some other way short of being the actual triggerman. RTA 3248. Unsatisfied, petitioner's counsel argued that he need time to investigate perhaps to show that petitioner's role was minor. RTA 3251. In response, the prosecutor said that his witnesses were present and that petitioner's counsel might talk with them to settle the question. RTA 3251.

The victim of the armed robbery in Yuba City in 1972 was also present to testify that petitioner hit him in the face with a shotgun and kicked him in the head. RTA 3251. One of the bystanders whose vehicle petitioner sought to hijack was also present to testify. RTA 3252. The state also was in touch with a Burlingame resident who witnessed the alleged assault in June 1978. RTA 3252.

The court suggested petitioner might have a one-week continuance to interview the state's witnesses. RTA 3253. However, to avoid a continuance, the prosecutor offered to limit his proof to the verdict on the 1968 robbery charge and petitioner's plea of

guilty to the 1972 robbery and to drop the charge concerning the 1978 assault and battery in Burlingame and to offer his witnesses to petitioner's counsel to decide whether counsel wished to delve behind the convictions. RTA 3254-55. The court thus denied the requested continuance upon the conditions offered by the state. RTA 3256.

Petitioner claims that the order denying the requested continuance denied him due process of law. Had the requested continuance been granted, petitioner argues, he would have been able to establish that petitioner was convicted in 1968 as an aider and abetter who either waited outside and drove the getaway car, or provided the car and gun to the actual robber. Further, petitioner argues, the delay would have allowed him to prove either that his 1972 guilty plea was not knowing and voluntary and to prevent its consideration by the jury, or that the weapon he used as a club was not loaded, and that petitioner was under the influence of drugs and the robbery was committed on the spur of the moment to obtain drugs "with the taking of money only an afterthought."

The federal due process clause guarantees against arbitrary and fundamentally unfair government conduct. See Wolff v. McDonnell, 418 U.S. 539, 558 (1974)(citing Dent v. West Virginia, 129 U.S. 114, 123 (1889)); Spencer v. Texas, 385 U.S. 554, 563-64 (1967). To show denial of due process by refusal to grant a request by counsel for a continuance to prepare a defense, petitioner must show that the denial deprived him of the effective

assistance of counsel. See Unger v. Sarafite, 376 U.S. 575 (1964); White v. Ragan, 324 U.S. 760, 764 (1945).

Petitioner's counsel had notice of the state's intent to use the 1968 and 1972 convictions since October 19, 1979, prior to trial. Most of the "defense" to these convictions that petitioner now proffers was within petitioner's knowledge, and some of it was uniquely within petitioner's knowledge. No continuance was necessary to attempt to show that petitioner's 1972 guilty plea was infirm, or to show his state of mind at the time of the 1972 robbery, as petitioner himself was the only source of such evidence.[17] The state's delivery of the police reports on the eve of the penalty selection phase of the trial, which provoked the request for continuance, is not relevant to counsel's failure to investigate and prepare prior to the eve of the penalty phase. Put another way, it was not the denial of the continuance that deprived petitioner of effective assistance of counsel.

Furthermore, even assuming that armed with tardy police reports and additional time petitioner might have been able to make the demonstration he now relies upon, denial of the requested continuance did not prejudice petitioner. Had the continuance been granted, the state would have undoubtedly introduced specific evidence regarding petitioner's violent role in the prior criminal incidents in rebuttal to petitioner's effort to minimize his prior

---

[17] The factual basis for petitioner's contention that his 1972 guilty plea was invalid is set forth below in the discussion of his Claim T.

conduct. In light of the denial, the penultimate facts underlying the 1968 and 1972 convictions dropped out of the case entirely. The jury heard no evidence that petitioner attempted to hijack a car to make good an escape from the 1968 robbery scene. The jury did not hear the victim of the 1972 robbery testify that petitioner hit him in the head with a shotgun used as a club, loaded or unloaded, and then kicked him in the head.[18] Additionally, the state's evidence of an uncharged assault and battery in Burlingame in June 1978 dropped out. Because of the restrictions of proof imposed upon the prosecutor as a condition to denial of the request, it is not at all clear that the jury would have had a better view of petitioner had the continuance been granted. Rather, the prosecution may have been able to adduce additional aggravating evidence. Thus, the denial of petitioner's request for a continuance to prepare his defense to the two prior convictions did not violate his due process, and claim S will be denied.

V.

**CLAIM T -- USE OF INVALID PRIOR CONVICTION**

Petitioner contends that his 1972 armed robbery conviction was invalid because he was not advised of his constitutional rights before waiving them by pleading guilty pursuant to a plea bargain requiring the state to drop a charge of a prior robbery that may have later exposed petitioner to prosecution as an habitual offender. Petitioner claims that use of an invalid prior

---

[18] Petitioner denies kicking the victim in the head. Pet. Exh. No. 45.

conviction violated his Fifth, Sixth, Eighth and Fourteenth Amendment rights.

This claim stands on petitioner's March 1989 affidavit that he pleaded guilty in exchange for the state's agreement to drop an allegation of a prior robbery conviction (which immunized petitioner against a subsequent prosecution as an habitual offender), without advice by the judge, district attorney or counsel that he had a right to a jury trial, the right to confront and cross-examine witnesses and the privilege not to be compelled to incriminate himself.  Petitioner does not claim that he did not know he had these rights but rather that no one reminded him, and that the benefit of the plea bargain was so very attractive that the fact that he was waiving these rights was not on his mind. Pet. Exh. No. 60.

At the relevant time, California Penal Code § 667.5 provided for enhancement of prison terms for new offenses because of prior prison terms.  The information filed July 5, 1979, charged both the 1968 and 1972 convictions.  CT 210-211.  Before opening statements petitioner admitted the two convictions "subject to any constitutional arguments that might be advanced at the time of judgment and sentencing."  RTA 1652.  The trial court stated the admission slightly differently - that petitioner "admit[ted] the two alleged prior convictions reserving [his] right to raise the question as to the constitutionality of either or both of those convictions."  RTA 1652.

////

Under California law, a constitutionally invalid prior conviction cannot be used to enhance punishment, see People v. Coffey, 67 Cal.2d 204, 215 (1967), if a defendant denies prior convictions charged to enhance sentence, the issue must be tried and the prosecution must prove beyond a reasonable doubt each element, i.e., that defendant was convicted, that the conviction was for a felony, and that defendant served a term of imprisonment. See People v. Morrison, 26 Cal.App.2d 616 (1938). However, if the defendant, as here, admits the prior convictions, the charge must not be read to the jury nor alluded to in the trial. Cal. Penal Code §§ 1025, 1093(a); see also CT 211. Thus, by admitting the priors while preserving the right to argue constitutional impediments to their use, so long as petitioner did not testify and subject himself to impeachment by proof of the prior felony convictions, see Cal. Evid. Code § 788, the jury trying him for murder during a robbery would never hear of the two prior robbery convictions - legal arguments about the constitutionality of the convictions or their use would be made only to the trial judge after guilt or innocence was decided by the jury.

When the jury returned a verdict of guilty of capital murder, use of the prior convictions to enhance the punishment for a lesser-included offense became moot, but the admitted prior convictions took on new significance pursuant to Penal Code § 190.3 as factors properly considered in choosing between life imprisonment or death again so long as not tainted by unconstitutionality.

Although petitioner preserved his entitlement to assert constitutional challenges to both the 1968 and 1972 prior robbery convictions, counsel relinquished the opportunity by failing to adequately prepare to argue the validity of the 1972 conviction.[19] The reasonable inference is that trial counsel, either strategically or negligently, waived the opportunity to assert a constitutional challenge to the 1972 conviction.

Even if the waiver was due to the inadequate performance of counsel, the 1972 conviction does not appear to be unconstitutional. In Boykin v. Alabama, 395 U.S. 238 (1979), the Supreme Court held that a constitutionally valid guilty plea depends upon a record that defendant knowingly and voluntarily waived his right to jury trial, confrontation and privilege against self-incrimination. In Parke v. Raley, 506 U.S. 20 (1992), the Court held that the Boykin ban against presuming waiver from a silent record does not apply on habeas corpus if the defendant did not appeal the conviction; rather, a prior final conviction is entitled to a presumption of correctness. Thus, petitioner here has a burden of adducing evidence that the 1972 conviction was invalid.

---

[19] Even if petitioner then successfully raised his challenge to his 1972 guilty plea, the jury would have heard the more damning facts underlying the conviction. The state was prepared to adduce the evidence of the robbery victim who would have testified that petitioner hit him in the face with a shotgun and kicked him in the head. RTA 3251. One of the bystanders whose vehicle petitioner sought to hijack was also present to testify. RTA 3252. This evidence would likely have cast petitioner in a light worse than simply reading a jury verdict of guilt of first degree robbery.

The only evidence in support of petitioner's claim is his own affidavit made on death row in 1989 that neither the judge, prosecutor or his own counsel reminded him of the rights he exercised in 1968 when he pleaded guilty in 1972 pursuant to a plea bargain that petitioner believed immunized him from a future habitual criminal prosecution. Because petitioner had counsel in 1972, his claim is properly analyzed under the Sixth Amendment guarantee of effective assistance of counsel. Under this analysis, petitioner must prove that his counsel was incompetent and that but for the denial of effective assistance, petitioner was prejudiced because he would not otherwise have pleaded guilty. Hill v. Lockhart, 474 U.S. 52 (1985). Petitioner has demonstrated neither that his counsel for the 1972 conviction was inadequate, nor that he would not have pleaded guilty in 1972 had he been explicitly advised about the constitutional rights he waived by pleading guilty. Accordingly, Claim T will be denied for lack of proof of the invalidity of the prior conviction.

**VI.**

**CLAIM U - OTHER CRIMES INSTRUCTIONS**

At the time of petitioner's penalty phase, California Penal Code § 190.3 provided that in determining whether the penalty was to be death or life imprisonment without possibility of parole, the trier of fact must take into account, among other things, "the presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Cal. Penal

Code § 190.3(b).

Petitioner claims that the prosecutor failed to specify what specific evidence it adduced pursuant to this provision; that the trial court erred in failing to instruct that, properly to be considered, each aggravating circumstance must constitute a criminal offense; that the state must prove the corpus delicti apart from petitioner's admission; and that the matters must be proved beyond a reasonable doubt.[20]

The Eighth Amendment requires adherence to two basic steps in the capital decisionmaking process: an "eligibility" decision and a "selection" decision. To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment. Coker v. Georgia, 433 U.S. 584 (1977). The defendant is constitutionally "eligible" for the death sentence if the trier of fact convicts him of murder and finds an aggravating or special circumstance. Lowenfield v. Phelps, 484 U.S. 231 (1988); Zant v. Stephens, 462 U.S. 862 (1983). The aggravating circumstance must be free of vagueness and must rationally narrow the broad class of murderers to a smaller group eligible for the death sentence. Godfrey v. Georgia, 446 U.S. 420, 428 (1980). All of these federal constitutional requirements were satisfied in this case.

////

---

[20] In People v. Robertson, 33 Cal.3d 21 (1982), the California Supreme Court held that such an instruction is required under state law because such evidence may have a particularly damaging impact on the selection decision.

At the selection stage the judge or jury determines whether an eligible defendant should in fact suffer the death penalty. During the penalty phase, the Constitution requires only a principled "individualized determination on the basis of the character of the individual and the circumstances of the crime." Zant, supra, at 879. Selection factors also must not be "too vague." Id. In Tuilaepa v. California, 512 U.S. 967 (1994), the Supreme Court found that "prior criminal activity" is not an unconstitutionally vague selection factor. The Court explained that:

> "Factor (b) is phrased in conventional and understandable terms and rests in large part on a determination whether certain events occurred, thus asking the jury to consider matters of historical fact. Under other sentencing schemes, in Texas for example, jurors may be asked to make a predictive judgment, such as "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." . . . Both backward-looking and a forward-looking inquiry are a permissible part of the sentencing process, however, and the States have considerable latitude in determining how to guide the sentencer's decision in this respect."

Tuilaepa, 512 U.S. at 976-977.

A principled individualized sentencing hearing is one in which due process guarantees are respected, assistance of counsel is provided, and defendant is accorded a right of allocution. Clemons v. Mississippi, 494 U.S. 738 (1990) (due process); Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254 (1967) (assistance of counsel); Estelle v. Boardman, 957 F.2d 1523 (9th Cir.), cert. denied, 506 U.S. 904 (1992) (allocution). If, as the Court held in Tuilaepa, predictive evidence of future criminal activity at the selection hearing is

permissible then it is clear that the Constitution does not require the other procedural protections upon which petitioner bases this claim. No authority cited asserts that the Eighth Amendment commands procedural and evidentiary rules, such as notice of evidence and burdens of proof, during the penalty phase.

Unless a specific federal constitutional guarantee is implicated, the federal inquiry is limited to whether claimed errors so infected the trial with unfairness as to deprive the defendant of due process. Romano v. Oklahoma, 114 S.Ct. 2004, 2012 (1994). Contrary to petitioner's assertion, the Constitution does not require the prosecutor to specify which specific evidence of past criminal activity it adduced pursuant to factor (b), to establish that each alleged activity constitutes a criminal offense, or to prove beyond a reasonable doubt the corpus delicti apart from petitioner's admission. See, e.g., Pulley v. Harris, 465 U.S. 37, 41 n. 4 (1984)(noting without disapproval appellate court's holding that factors required for selecting death sentence need not be found beyond a reasonable doubt); Walton v. Arizona, 497 U.S. 639 (1990)(sentencing decision need not be made by a jury); Campbell v. Kinscheloe, 829 F.2d 1453, 1461 (9th Cir. 1987) (holding that unadjudicated criminal activity may be used to show future dangerousness, and implying that past criminal activity may be proved without the procedural protections required to adjudicate criminal liability); Williams v. Calderon, 52 F.3d 1465, 1480-1481 (9th Cir. 1995)(requirement that criminal activity be proved beyond a reasonable doubt is state law error, not cognizable on federal

habeas); but see Deco v. Lashley, 507 U.S. 272 (1993)(evading question of entitlement to presumption of innocence of unadjudicated crimes considered as aggravating factors). Because petitioner is not entitled to the procedures he identified, this claim is without merit.

**VII.**

**CLAIM V -- USE OF ABSENCE OF MITIGATION AS AGGRAVATION**

Petitioner claims that the prosecutor's argument that the absence of four statutory mitigating factors constituted an aggravating factor deprived him of due process.

After speaking briefly about petitioner's criminal history (RTA 3315:26-3316:14), the prosecutor argued:

> We look next at whether or not the offense here was committed while the defendant was under the influence of extreme mental or emotional disturbance. Was he crazy? Was he under a lot of pressure because of a job? Was he trying to feed his family? Is that why this type of crime was committed? Again, the answer absolutely not. This crime was committed because of a desire to steal, to kidnap, to rape and to kill. Was not caused by any emotional disturbance or mental disturbance.
>
> Again, we total that one up. It is a factor in aggravation.
>
> We ask next whether the victim, whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act. It is hard to conceive of a more innocent victim . . . who on September 12th, 1978, was just trying to lead her life like the rest of us, just taking one step at a time, trying to go to work, had plans to buy a house, had a young son and husband, just trying to lead her life and just totally to her surprise she is snatched off the face of this earth, totally innocent victim. Again, absolute aggravation.
>
> There is no mitigation in the conduct of the victim in this case.

The next factor, whether or nor the offense was committed under circumstances which the defendant reasonably believed to be moral justification or extenuation for his conduct.

I hardly need to answer this for you. You sat through this case, heard about the decision Mr. Ainsworth pondered, whether he should allow [the victim] to live, to get medical help so she should live, and thus risk his freedom or whether he should regard his life and his freedom as superior to her right to live. He played God with [the victim's] life, that is an immoral justification of him for his conduct.

The next factor, whether or not the defendant acted under extreme duress or under the substantial domination of another person.

There is no question who was in charge from the moment that car left the parking lot until it found its final resting place on the cliffs above Pacifica.

There is no question Mr. Ainsworth was not forced by anybody or anything to do anything except exercise his own free will. That aggravates the crime.

Next, we ask whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as the result of mental disease or the effects of intoxication.

At most we have a few beers consumed during this spree, during the entire time though Mr. Ainsworth is doing his level best to avoid apprehension, to hide the body, to hide the car, to dispose of the evidence.

He certainly knew what the requirements of the law were. He certainly appreciated the criminality of his conduct.

We're not dealing here with a babe who is wet behind the ears. He knew what he was doing and he knew what he was doing was wrong, but chose to do it anyway. He appreciated the criminality of his conduct and chose not to conform it.

The next factor the law provides the age of the defendant at the time of the crime. Mr. Ainsworth, as his sister testified I believe, is thirty-five years old. We go back fourteen months, he's either thirty-three or thirty-four. We're not dealing with an

> eighteen-year old, a nineteen year old who just doesn't know any better and for lack of maturity did a senseless act. We're dealing with a full grown adult here. Again, a factor in aggravation.
>
> The next factor whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.
>
> Your verdict has already answered that particular question, was Mr. Ainsworth the heavy in this crime.
>
> Finally, we get to the catch-all factor, is there any other circumstance which extenuates the gravity of this crime, even though it is not a legal excuse for the crime?
>
> Can you think of anything in the world that even said to you in the slightest manner at all, well, it's okay what he did, that's what that is, some type of excuse for what he did. Not even the most fertile imagination can conjure up an acceptable rationale for his conduct.

RTA 3316:15-3319:6.

On petitioner's state court appeal, the California Supreme Court found that argument characterizing the absence of mitigating evidence as aggravating violated the spirit if not the letter of the Court's much later decisions in People v. Davenport, 41 Cal.3d 247 (1985) and People v. Rodriguez, 42 Cal.3d 730 (1986), but that petitioner was not prejudiced. Ainsworth, 45 Cal.3d at 1034.

In Tuilaepa, for instance, petitioner contended that consideration of "the age of the defendant at the time of the crime" was equivocal because the prosecution typically argues in favor of the death penalty based on the defendant's age, no matter how old or young he was at the time of the crime. The Court found no constitutional deficiency in this factor because "[b]oth the prosecution and the defense may present valid arguments as to the

significance of the defendant's age in a particular case. Competing arguments by adversary parties bring perspective to a problem, thus serve to permit a more reasoned decision, providing guidance as to a factor jurors most likely would discuss im any event." Tuilaepa, 512 U.S. at 975. In other words, petitioner's age at the time of the crime could be argued as mitigating or aggravating.

But as the California Supreme Court recognized in Davenport, several of the statutory "mitigating" factors are particularly unlikely to be found in most cases, e.g., factor (e) (whether or not the victim was a participant in the homicidal conduct or consented to it) and factor (f) (whether or not the offense was committed under circumstances that the defendant reasonably believed to be a moral justification or extenuation for his conduct). To allow the absence of these factors to be construed and argued as "aggravating" circumstances would mean that there were aggravating circumstances in almost every capital murder. It would also tend to confuse the meaning of the terms "aggravating" and "mitigating." An aggravating factor is a circumstance beyond the elements of the underlying crime that increases the justification for a more serious penalty than would otherwise be imposed. Zant v. Stephens, 462 U.S. 862, 876 (1983). A mitigating factor is one that though not an excuse or justification for the crime, may be considered as extenuating or reducing the defendant's moral culpability. Boyde v. California, 494 U.S. 370, 375 n.2 (1990)(citing People v. Easley, 34 Cal.3d 858 (1983)).

Thus the absence of mitigation does not necessarily render a crime more offensive. Davenport, 41 Cal.3d at 289. Accordingly, the California Supreme Court forbade the state from arguing that the absence of mitigation evidence was an aggravating circumstance. Id. But in Ainsworth the Court found that this same error was harmless

> "in view of the overwhelming 'other crimes' evidence. The evidence of two armed robbery convictions and two additional violent robberies must have been crucial in the determination whether the death penalty was appropriate for the defendant, certainly more crucial than the fact that defendant was 'not crazy,' not 'in charge,' and was in his middle 30's. In sum, these considerations compel a conclusion that the prosecutor's comments could not have been prejudicial under any applicable standard."

People v. Ainsworth, 45 Cal.3d 984, 1034-35 (1988).

Petitioner argues, on the basis of the reasoning of Davenport, that he was denied due process of law because by allowing the state to argue that the absence of mitigating circumstances constituted aggravating circumstances, the state was relieved of its burden of adducing evidence of one or more aggravating circumstances at the penalty selection phase. Although Tuilaepa forecloses consideration of a federal claim based upon the reasoning of Davenport, see Tuilaepa 512 U.S. at 977, petitioner's argument also rests upon the Supreme Court's decision in Walton v. Arizona, 497 U.S. 639 (1990). There, an Arizona statute requiring the trial judge to sentence a capital defendant to death if the court found one or more aggravating circumstances and "no mitigating circumstance sufficiently substantial to call for leniency."

The statute placed the burden of establishing aggravating circumstances on the prosecution and put the burden of establishing mitigating circumstances on the defendant. The Court held

> "[s]o long as a State's method of allocating the burden of proof does not lessen the State's burden to prove . . . the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency."

497 U.S. at 650.

Petitioner's Walton argument is that by allowing the state to argue the absence of potential mitigating circumstances as aggravating circumstances, it lessened the state's burden of proving aggravating circumstances justifying petitioner's selection for death. Had there been no legitimately aggravating circumstances, this may have been error. But, as the California Supreme Court found, the state met its burden by adducing "other crimes" evidence, and there seems little doubt that the jury did not depend solely upon the absence of mitigating evidence.

Thus, in the case at bar it was not error for the prosecutor to argue that the lack of mitigating evidence as to those factors should be construed as aggravating factors.

## VIII.

## CLAIM W - JURY UNANIMITY ON UNADJUDICATED CRIMINAL CONDUCT

Petitioner claims that the federal constitution required an instruction that unadjudicated prior criminal conduct could not be considered by the jury unless all jurors agreed that petitioner in fact committed the offenses.

There is no federal constitutional requirement that the sentencing selection decision be made by a jury and, hence, no requirement that a jury unanimously agree upon defendant's guilt of prior unadjudicated criminal activity or any other factor urged in aggravation. See Walton v. Arizona, 497 U.S. 639 (1990). Thus, petitioner's claim is without merit.

**IX.**

**CLAIM X - VICTIM IMPACT**

Petitioner claims that the prosecutor's plea for sympathy for the victim's family denied him due process of law. The prosecutor argued in pertinent part as follows:

> I expect Mr. Christiansen in essence to be asking you for a little mercy for Mr. Ainsworth.
>
> There is a proverb that says as a man shuts his eyes to the cry of the poor he too will cry out and not be answered. That's an indication of what your response should be to any request for mercy in this case. Nancy Huynh cried out for a break, cried out for a chance to live and it fell on deaf ears. He too will cry out and not be answered.
>
> This plea for mercy will come in many forms and appeal to your sympathy. His young child was brought into court here, cried for you as if to tug at your heart strings. If you want to feel any mercy or sympathy for a child in this case, think of Michael Huynh, if you want to think of sympathy for people in this case, think of Nancy Huynh, think of Robert Huynh, think of the lives that this has just utterly devastated.

RTA 3320-3321.

Such "victim impact" argument is a permissible method of reminding the sentencing jury of the specific harm caused by the crime in question, which is information necessary meaningfully to assess the defendant's moral culpability and blameworthiness.

Payne v. Tennessee, 501 U.S. 808, 825 (1991)(overruling Booth v. Maryland, 482 U.S. 496 (1987) and South Carolina v. Gathers, 109 S.Ct. 2207 (1989)). See also People v. Edwards, 54 Cal.3d 787, 724-727 (1991). Accordingly, petitioner's claim lacks merit.

**X.**

**CLAIM Y - DESCRIPTION OF EXECUTION**

Petitioner claims that refusal to allow defense counsel to read to the jury a press account of an execution denied petitioner due process of law. A description of an execution is irrelevant to petitioner's moral culpability, character, prior record, or the circumstances of the offense. Thus it appears that he had no right to present such evidence at the sentencing hearing. Harris v. Pulley, 692 F.2d 1189, 1203-1204 (9th Cir. 1982), reversed on other grounds, Pulley v. Harris, 465 U.S. 37 (1984); and Johnson v. Thigpen, 806 F.2d 1243, 1250-51 (5th Cir. 1986). This claim will be denied.

**XI.**

**CLAIM Z - BURDEN OF PROOF**

Petitioner claims that he was denied due process of law by the trial court's instruction that "there is no burden of proof on either side." This argument was rejected in Harris v. Pulley, 692 F.2d at 1194-1195, and the claim will be denied.

**XII.**

**CLAIM AA - DENIAL OF FULL CONSIDERATION OF MITIGATING EVIDENCE**

California Penal Code § 190.3(j) provided that the trier of fact may consider "any other circumstance which extenuates the

gravity of the crime even though it is not a legal excuse for the crime." Petitioner contends that the instruction precluded consideration of mitigating circumstances that did not relate to the crime.

The trial court instructed the jury that in determining which penalty to impose the jury must consider, take into account, and be guided by the statutory factors including "any other circumstances which extenuates the gravity of the crime even though it is not a legal excuse for the crime." RTA 3332. This instruction was approved by the Supreme Court in Boyde v. California, 110 S.Ct. 1190, 1196-1201 (1990)(the Court analyzed factor (k) of 1978 law which is identical to factor (j) considered in this case). For the reasons identified there, this claim shall be denied.

**XIII.**

**CLAIM BB - THE CUMULATIVE EFFECT OF THE ERRORS**

Petitioner claims that the cumulative effect of the errors at the penalty phase of his trial denied him due process of law. Where asserted errors may have been unconstitutional, but where findings of no prejudice as to the individual errors are made, the errors en toto may nonetheless present a claim for cumulative error sufficient to overturn a death sentence. Mak v. Blodgett, 970 F.2d 614 (9th Cir. 1992); United States v. Tucker, 716 F.2d 576, 595 (9th Cir. 1983). Here, petitioner has not pointed to any errors which did not stem from counsel's inadequate performance, so this claim is moot.

## XIV.

## CONCLUSION AND ORDERS

For the foregoing reasons petitioner's application for habeas corpus on claim "R" is GRANTED, and his application on claims "S" through "BB" is DENIED. Petitioner's sentence of death is hereby VACATED, and the underlying matter is REMANDED to the Superior Court of the State of California for the County of Sacramento to either commence a new penalty phase trial or sentence petitioner to life in prison without the possibility of parole within sixty (60) days of the effective date of the order.

IT IS SO ORDERED.

DATED: September 2, 1999.

LAWRENCE K. KARLTON
CHIEF JUDGE EMERITUS
UNITED STATES DISTRICT COURT

United States District Court
for the
Eastern District of California
September 2, 1999

* * CERTIFICATE OF SERVICE * *

2:90-cv-00329

Ainsworth

v.

Vasquez

---

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on September 2, 1999, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.

Quin Denvir
Federal Defender
801 K Street
Suite 1024
Sacramento, CA 95814

SJ/LKK

TM/PAN

James S Thomson
Law Offices of James S Thomson
819 Delaware Street
Berkeley, CA 94710

Michael G Millman
California Appellate Project
One Ecker Place
Suite 400
San Francisco, CA 94105-2752

J Robert Jibson
Suite 125
Attorney General's Office of the State of California
PO Box 944255
1300 I Street
Suite 125
Sacramento, CA 94244-2550

William George Prahl

Attorney General's Office State of CA
P.O. Box 944255
1300 I St.
Suite 125
Sacramento, CA 94244-2550

Warden Arthur Calderon
Office of the Warden
San Quentin State Prison
Tamal, CA 94964

Jack L. Wagner, Clerk

BY: ______________________
Deputy Clerk